# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist CHRISTOPHER B. HINES**
**United States Army, Appellant**

ARMY 20131049

Headquarters, III Corps and Fort Hood
Gregory A. Gross, Military Judge
Colonel Richard W. Rousseau, Staff Judge Advocate (pretrial)
Colonel Ian G. Corey, Staff Judge Advocate (post-trial)

For Appellant:  Captain Jennifer K. Beerman, JA; Frank J. Spinner, Esquire (on brief).

For Appellee:  Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Tara E. O'Brien, JA (on brief).

27 July 2016

----------------------------------
OPINION OF THE COURT
----------------------------------

WOLFE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of one specification of aggravated sexual assault and one specification of abusive sexual contact, in violation of Article 120, [hereinafter UCMJ], 10 U.S.C. § 920 (2006 & Supp. IV 2011).[1]  The court-martial sentenced appellant to be dishonorably discharged from the Army, to be confined for fifteen

---

[1] As discussed below, the court-martial returned findings of guilty to two specifications of aggravated sexual assault and two specifications of abusive sexual contact.  After findings, the military judge granted a defense motion to dismiss two specifications as unreasonably multiplied.  *See United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001).

years, and to be reduced to the grade of E-1. The convening authority approved the sentence as adjudged.

This case is before us pursuant to Article 66(b), UCMJ. Appellant raises four assignments of error, three of which merit discussion, and one of which merits relief.[2] Appellant alleges the military judge erred in denying the defense challenge for cause. This requires a detailed discussion, even though we determine no relief is warranted. We also determine the military judge did not err in deciding not to give a mistake of fact instruction as to consent. Lastly, we grant appellant sentencing relief because of the unreasonable post-trial delay in this case.

## BACKGROUND

*A. Evidence at Trial*

Private First Class (PFC) JJ testified that she and Specialist (SPC) Garcia, a female friend, attended a "house party" in Killeen, Texas, just outside of Fort Hood. Appellant was also at the party. While PFC JJ was familiar with appellant, and had "friended" him on Facebook, she stated they had never "spoke[n] on a personal level, it was just an, I've seen you before [sic]."

At the party, PFC JJ had at least three "triple shot" alcoholic drinks. She testified it was the first time she drank alcohol in any quantity. During party, PFC JJ did not dance, drink, or spend time with appellant.

Well into the night, local police disrupted the party. Hearing of the police presence, SPC Garcia and PFC JJ were concerned. They were too drunk to drive home and PFC JJ was not old enough to drink alcohol legally. They decided to go to one of the bedrooms, where they got in bed and quickly both fell asleep.

Specialist Garcia testified that her next memory was of appellant grabbing her leg and climbing into bed with the two women. She testified that she left the bedroom when she heard moaning coming from PFC JJ.

Private First Class JJ testified that her next memory was waking up to appellant rubbing her buttocks. She recalled SPC Garcia then leaving the room. While she admitted that her memory was "poor," she said her next memory was appellant's penis penetrating her. At this point, she said she "froze up" but was able to murmur the word "stop." Appellant did not stop. At some point, someone opened the door letting light into the bedroom. The light allowed PFC JJ to identify

---

[2] Appellant's first assignment of error asserted the evidence was both factually and legally insufficient to support the court-martial's findings. After reviewing the record, we disagree.

appellant as the person on top of her. She testified that she did not know who her assailant was prior to this. When appellant later got off of PFC JJ, she identified him a second time as he opened the door to leave the room.

The next morning, after leaving the party, and while driving in a car, PFC JJ told SPC Garcia and another soldier she had been "raped." None of them, however, reported the crime. Later, when a non-commissioned officer questioned her about changes in her behavior, PFC JJ disclosed the assault.

At trial, in addition to the testimony of PFC JJ and SPC Garcia, the government offered into evidence electronic messages sent by appellant. The morning after the party, appellant asked PFC JJ in a message "Hey.. About last night. Are you upset with me?" Private First Class JJ responded as follows:

> Yeah that shit wasn't right at all, dude I was
> asleep on top of that. You knew. What the fuck was
> going through your head. Scratch that I don't wanna talk
> about it. Just stay away[.]

The defense theory at trial was that PFC JJ fabricated the assault to avoid the social stigma of having consensual sexual intercourse with appellant. Specifically, the defense asserted that PFC JJ was concerned about the person who opened the door and saw her having sex with appellant. The defense presented SPC Rodriguez who testified that he was the person who opened the door to the bedroom and briefly observed appellant and PFC JJ having intercourse and that they "both sounded pleasurable." On cross, SPC Rodriguez admitted he was friends with appellant. The government also confronted SPC Rodriguez with text messages he had sent PFC JJ calling her a "bitch" and implying that she was going to hell.[3] Appellant did not testify.

The panel convicted appellant of all offenses.

### B. Dismissal of Specifications after Findings

Appellant was arraigned on two charges of aggravated sexual assault and two charges of abusive sexual contact. For each type of offense, the government charged appellant with the alternative theories–that the offense had been committed by bodily harm and while PFC JJ was substantially incapacitated. During a pretrial

---

[3] The cross-examination was even more damaging because SPC Rodriguez first denied sending PFC JJ more than one message. When confronted with the actual messages, he continued to deny sending them. After a recess where the defense counsel re-interviewed SPC Rodriguez, he then testified that he had sent the messages in question.

motions session, the defense moved to dismiss one of each specification as being unreasonably multiplied. *See generally United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001). The government agreed the offenses had been charged in the alternative. *See United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014) (convictions for the same offense cannot stand when offenses were charged in the alternative). The military judge deferred ruling on the motion until after findings.

When the panel convicted appellant of all offenses, the military judge returned to this issue. The government asked the judge to merge the offenses only for sentencing. The trial counsel reasoned that dismissal could potentially provide appellant with a windfall if the remaining charges were set aside on appeal because of a defect that did not apply to the dismissed charges. The military judge initially stated he "normally" did not dismiss charges or specifications when offenses were plead in the alternative, and appeared sympathetic to the government's reasoning. However, the defense persisted and stated that a "fair trial" did not encompass preserving "the government's bets for what may happen on appeal." The military judge took the issue under advisement and, when he returned, dismissed the set of specifications that alleged an "incapacitation" theory of the offenses.[4]

---

[4] Had the military judge dismissed the specifications conditionally, his ruling would have been consistent with the recommendation offered by Judge Effron in *United States v. Britton*, 47 M.J. 195, 203 (C.A.A.F. 1997) (J. Effron concurring). Judge Effron's suggestion that appellate courts "conditionally dismiss" specifications when presented with issues of unreasonable multiplication at trial, clearly applies as well to military judges. *Id*. at 203. This court has previously approved the practice of conditional dismissal. *United States v. Woods*, 21 M.J. 856, 876 (A.C.M.R. 1986). The use of conditional dismissals, while not widely practiced, has been approved by every service court. *See United States v. Thomas*, 74 M.J. 563, 570 (N.M. Ct. Crim. App. 2014); *United States v. Stanley*, 60 M.J. 622, 630 (A.F. Ct. Crim. App. 2004); *United States v. Frazier*, 51 M.J. 501 (C.G. Ct. Crim. App. 1999). As Judge Effron noted, the military judge is best positioned to initially assess the issue and should make an initial decision as to whether offenses are unreasonably multiplied. This way, at the trial stage, the accused is relieved of the prejudice of standing convicted of more offenses than is warranted and the government's appellate risk is minimized as the dismissal is conditioned on the remaining specifications surviving appellate review. This approach is favorable, especially given that not all cases qualify for review under Article 66(b) or appeal may be waived or withdrawn. (In other words, a military judge should not assume that a court of criminal appeals will always address the error on appeal). Nonetheless, when a military judge conditionally dismisses a specification as unreasonably multiplied, the military judge should clearly state that the dismissal of the one specification is conditioned on a second specification surviving appellate review. That way, the intent of the military judge is clearly stated, and the parties on appeal are fully on notice of the matter.

Accordingly, appellant was not convicted of any offense under an incapacitation theory.

## LAW AND DISCUSSION

### A. Challenge for Cause

On appeal, appellant argues that the military judge abused his discretion when he denied a defense challenge for cause. During the course of voir dire, the defense asked a series of questions about alcohol and the ability to consent. Several panel members gave answers that warranted additional inquiry. It is the military judge's denial of one of the defense's challenges that merits discussion.

### 1. The Defense Challenge

During general voir dire, the defense counsel asked the panel members "[d]oes any panel member believe that the consumption of any alcohol automatically renders an individual unable to consent to sexual activity?" Sergeant First Class (SFC) JS responded affirmatively.

After the conclusion of general voir dire, the military judge inquired of the panel as follows:

> Panel members, Colonel [P] stated his understanding of the Army policy regarding alcohol and sex and that if someone is inebriated they cannot consent to sexual activity. And that [SFC JS], you stated that if you have any alcohol or if the person has any alcohol, you cannot consent to sexual activity. And then Master Sergeant [L], you had a little bit different spin on it and it is that you simply said that alcohol and sex, they shouldn't be mixed, something like that.
>
> Let me tell you all this. I will give you the legal definition of substantially incapacitated, substantial [sic] incapable as charged in this case. Do you all agree to follow my instruction on the law in this case?

Every member agreed to follow the military judge's instruction. During individual voir dire, SFC JS was questioned about her initial answer in general voir dire. In response to both trial and defense counsels' questions, she agreed that this belief was a good policy to avoid individuals being taken advantage of. She further explained that if someone had any alcohol in their system they could not consent to sexual intercourse. The military judge then had the following colloquy with SFC JS:

MJ:  Okay.  And now, that is not the law, that is okay if you - - -

MBR [SFC JS]:  Right.

MJ:  - - - - if you - - - if that is your opinion that is okay.

MBR [SFC JS]:  Right.

MJ:  But we need to know that.

MBR [SFC JS]:  Yes.

MJ:  And so, I will tell you the definition of when someone is substantially incapacitated or substantially incapable of consenting or understanding the nature of the actions.  Do you agree to follow my instruction on the law and not your personal opinions?

MBR [SFC JS]:  Yes, sir.

MJ:  Are you going to have any problem - - - -

MBR [SFC JS]:  No.

MJ:  - - - - at all distinguishing between the two?

MBR [SFC JS]:  No, sir.  No.

MJ:  No?  Okay.  If you are that is okay.

MBR [SFC JS]:  No, I am not.

MJ:  And you get to go home right now.

MBR [SFC JS]:  No. [Member and counsel laugh].

MJ:  That is no problem.  All right.  But you are sure it won't affect you?

MBR [SFC JS]:  Yes, I can follow your instructions, sir.

Both counsel then declined the military judge's invitation to further voir dire SFC JS. While the military judge granted several defense challenges for cause, he denied the defense challenge to SFC JS. In denying the defense's challenge, the military judge summarized the colloquy he had with SFC JS, specifically noting her willingness to follow his instructions on the law. The military judge found no actual bias, and noted that "[e]ven considering the liberal grant mandate and implied bias, the challenge is denied."

The defense exercised their preemptory challenge on a member other than SFC JS.

*2. Law*

Our superior court recently reiterated the standard of review of challenges for cause based on implied bias:

> "This Court's standard of review on a challenge for cause premised on implied bias is less deferential than abuse of discretion, but more deferential than de novo review." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010). Under this standard, "[w]e do not expect record dissertations but, rather, a clear signal that the military judge applied the right law." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002). Indeed, "where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." *Id.* As we have previously made clear, however, "[w]e will afford a military judge less deference if an analysis of the implied bias challenge on the record is not provided." [*United States v.*] *Peters*, 74 M.J. [31,] [] 34 [(C.A.A.F. 2015)]. In cases where less deference is accorded, the analysis logically moves more towards a de novo standard of review.
> . . .
> Rule for Courts-Martial (R.C.M.) 912(f)(1)(N) sets forth the basis for an implied bias challenge. *Peters*, 74 M.J. at 34. "The focus of this rule is on the perception or appearance of fairness of the military justice system." *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995). "While actual bias is reviewed through the eyes of the military judge or the court members, implied bias is reviewed under an objective standard, viewed through the eyes of the public." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001). "In reaching a determination of

> whether there is implied bias . . . the totality of the
> circumstances should be considered." *Peters*, 74 M.J. at
> 34.

*United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016).  On the other hand, our superior court has repeatedly stated that "when there is no actual bias, 'implied bias should be invoked rarely.'" *United States v. Armstrong*, 54 M.J. 51, 54 (C.A.A.F. 2000) (citing *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998)); *see also Wiesen*, 56 M.J. at 174; *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007); *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004).

### *3. Standard of Review*

As an initial matter, we assess how much deference the military judge's denial of the challenge is due.  Our superior court has found the degree of deference depends on the degree to which the military judge places his or her reasoning and observations on the record.[5]  In the present case, while the military judge's ruling summarized the relevant evidence and stated he was applying the liberal grant mandate, he did not include his reasoning when ruling on the challenge.  Accordingly, as in *Rogers*, "[a]s the military judge did not perform an implied bias analysis on the record, our review of [his] analysis will move more toward a de novo standard of review." *Rogers*, 75 M.J. at 273.

### *4. United States v. Woods and United States v. Rogers*

The issue this case presents is not unfamiliar to courts-martial.  When a panel member holds a view of the law that is incorrect, when should a military judge grant

---

[5] Although our superior court has never explicitly said so, we understand that an implied bias analysis is viewed through the eyes of a member of the public *watching the proceedings*.  That is, the hypothetical member of the public has the same information as the military judge who is ruling on the challenge.  In *Woods*, the court specifically stated that "resolving claims of implied bias involves questions of fact *and demeanor*, not just law." *United States v. Woods*, 74 M.J. 238, 243 n.1 (C.A.A.F. 2015) (emphasis added).  In so doing, our superior court appears to have rejected earlier cases that discarded demeanor evidence. *Id*. at 242-43.  The *Woods* opinion, however, makes sense.  A stale transcript will not include key information available to the military judge and a member of the public sitting in the gallery.  The same words, stated with candor, evasion, or hesitation *should*, on the margin, result in different results.  Were it otherwise, the military judge would have to ignore the tenor of the members' answers whether they be to the prejudice of the government or defense.  Nonetheless, if the military judge's reasoning is based–even in part–on considerations that will not be reflected in the record, it is incumbent on the military judge to explicitly state those considerations.

a challenge for cause for implied bias?  We find two recent cases by our superior court to be instructive.

In *United States v. Woods*, 74 M.J. 238, 239 (C.A.A.F. 2015) a panel member in a pretrial questionnaire expressed an opinion that in the military "you are guilty until proven innocent."  Additionally, it is clear that the panel member not only thought this to be the correct legal standard, but described this standard as being "essential" to the military mission.  *Id*.  During voir dire, after being told the correct standard, the member stated she could follow the military judge's instructions.  *Id*. at 241.  Our superior court quoted the colloquy between the member and the military judge at length as well as the military judge's findings.  *Id*. at 241-42.  Notwithstanding the military judge's detailed assessment of the member's readiness to accept the judge's instructions, our superior court found error.  *Id*. at 244.

The *Woods* court, however, explicitly rejected a per se rule "that a panel member's mistake as to the proper burden of proof in a criminal trial, without more, necessarily requires a finding of implied bias."  *Id*.  Rather, consistent with case law, the court looked at the "totality of the circumstances."  *Id*.  The court then focused on three considerations that they determined warranted reversal.  First, and relevant to public perceptions of fairness, they noted the convening authority had the member's questionnaire for two months prior to detailing the member to the court-martial.  Second, they noted the burdens of proof are "fundamental tenets of U.S. criminal law that predate[] the founding of the republic."  *Id*.  In other words, the *Woods* panel member was not just mistaken about a legal technicality, but expressed a belief that service-members were deprived of fundamental trial rights.  Finally, the court noted that in the absence of an operational military necessity, the public might question why the member, who would serve as the highest ranking member of the panel, was retained.[6]  *Id*. at 245.

---

[6] We note that our superior court's reasoning of "operational necessity" could be understood to sanction a flexible standard for implied bias depending on operational requirements.  That is, what would qualify as implied bias in one case might not qualify as implied bias in another case if "operational requirements" would favorably affect the public's perception of the case.  Thus, for example, on the margin, the military judge might deny a challenge for cause if additional members could only be obtained at significant expense or delay.  We are wary about allowing a military judge to consider (and the government to introduce) such considerations when ruling on a member's fitness.  *See e.g. United States v. Wilson*, ARMY 20130601, 2016 CCA LEXIS 287, at *14-15 (Army. Ct. Crim. App. 5 May 2016) ("When a military judge considers a defense challenge for cause, the military judge's ruling must be based on legal norms, not procedural or practical concerns. . . . In other words, the umpire must call the pitch as it crosses the plate.  A strike is a strike—no matter what inning; no matter the score.").

In *Rogers*, our superior court addressed a case in which the panel member expressed a view, obtained from military training, that a person who is too drunk to form memories is incapable of consenting to sexual intercourse. She further expressed an improper burden shift to the defense in that they would have to "work hard to make me believe [that such a person was] able to give consent. . . . That would have to be proven to me." 75 M.J. at 272.

Our superior court found that the military judge erred in denying the challenge for cause. In doing so, the court focused on several points. First, the military judge in *Rogers* never corrected the member's incorrect view of the law, but rather "effectively endorsed her erroneous understanding. . . ." *Id.* at 274-75. Second, the court focused on the importance of the misunderstanding in relation to the evidence introduced at trial. *Id.* at 273. Third, when the members asked for additional guidance on the definition of "competent" the military judge advised them to use their "understanding of the common definition of the word." *Id.* at 274. Lastly, although not expressly affecting their reasoning as in *Woods*, the court noted the panel member in question was the "senior ranking member" and "president of the panel." *Id.* at 272.

"Members are not and should not be charged with independent knowledge of the law." *Woods*, 74 M.J. at 244. There is no per se rule that requires a member's exclusion because of an initial erroneous view of the law. *Id.* However, it is equally clear from *Woods* that, in some cases, a military judge must grant an implied bias challenge for cause based on a member's incorrect view of the law notwithstanding the member's candid and credible assertion that they will follow the military judge's instructions. In determining an implied bias challenge, we are required to view the facts through the eyes of an objective member of the public, considering the totality of the circumstances. *Bagstad*, 68 M.J. at 462.

In reviewing our superior court's decisions in *Woods* and *Rogers*, we discern the following non-exhaustive factors for evaluating the totality of the circumstances in cases where the military judge has denied an implied bias challenge for cause based on a member's erroneous view of the law:

First, whether there is evidence that the government caused or endorsed the member's erroneous view of the law. When the government creates or condones the member's misunderstanding of the law an objective member of the public may lose confidence in the fairness of the proceedings and the selection of the members. In *Rogers* the member stated that her erroneous understanding of the law came from official Coast Guard training. In *Woods*, the court noted the convening authority at least had "constructive notice" of the member's erroneous views for two months before selecting her as "best qualified" to sit on the panel.

Second, the degree to which the member's misunderstanding is on a fundamental principle of law or instead reflects a mere technical legal misunderstanding. While panel members are not required to have legal training, a member's view of the law may be so out of step with societal norms that an objective member of the public may question the fitness of the member. In *Woods*, the member's incorrect view of the law was on a "fundamental tenet"—the burden of proof.

Third, the degree to which the member's erroneous view of the law is strongly held. If a member expresses that a belief is deeply held or is founded on moral principles, a reasonable member of the public may question whether the member's belief will yield to the military judge's instructions. In *Woods*, the member believed it was essential to the military mission that an accused is guilty until proven innocent. In *Rogers*, the member likewise expressed that it would be "hard work" to get her to believe that someone who lacked memory could give consent.

Fourth, whether the military judge corrected the member's erroneous view of the law. If the military judge does not at least tell the member their view of the law is erroneous, an objective member of the public may lack confidence that the member applied the correct law in the case. In *Rogers*, the court held "that CDR K's *uncorrected* misunderstanding of a relevant legal issue would cause an objective observer to have substantial doubt about the fairness of Rogers' court-martial panel." *Rogers*, 75 M.J. at 271 (emphasis added).

Fifth, the importance of the legal issue in question to the case. An erroneous view of the law is unlikely to undermine public confidence in the court-martial unless it concerns an issue presented at trial. In *Rogers,* the court considered the importance of the evidence introduced, and the defense theory at trial when evaluating the "totality of the circumstances." *Id*. at 273.[7] The court found that

---

[7] We note our superior court's review in *Rogers* of the "totality of the circumstances" included facts developed after voir dire (e.g. the defense's theory, the testimony of the victim, and the member's question during deliberations). That is, the *Rogers* court did not limit the inquiry to the defense's assertions during voir dire about what the relevant issues in the case would be or their theory of the evidence. Thus, it appears that the *appellate* inquiry into an implied bias challenge is not limited to the facts in front of the military judge when he or she rules on the challenge. Or, put differently, we should review how an objective member of the public would view the panel member's fitness in light of the entire trial, not merely the evidence in front of the judge at the time of the challenge.

(continued . . . )

whether a victim with no memory of the assault was capable of consenting was "a fundamental question" in the case. Moreover, the member in *Rogers* specifically requested (but did not receive) additional instruction on the definition of competence. Similarly, in *Woods*, properly understanding the burden of proof was obviously critical.

Lastly, whether the member was the senior member of the panel. When the senior member of the panel holds an erroneous view of the law an objective member of the public could reasonably fear that the senior member's views were more likely to unduly influence the case. In both *Woods* and *Rogers*, it was the president of the panel who held the erroneous view of the law. In *Woods*, the Court of Appeals for the Armed Forces held that "[a]n informed member of the public might well, ask why, absent any operational military necessity, the military judge retained Navy Captain Villalobos *as the senior member* of this five-member panel." *Woods*, 74 M.J. at 245 (emphasis added).[8]

### 5. Analysis

We find this case distinguishable from *Woods* and *Rogers*. In evaluating the totality of the circumstances we assess the case as follows:

First, there is no evidence in this case that the government caused (or condoned) SFC JS's erroneous view of the law. Unlike *Rogers*, there is no evidence that her erroneous views of the law were from military training. While we are not unfamiliar with military training on sexual assault, and nothing in the record

---

( . . . continued)

In cases with few pretrial motions, a military judge will often have limited awareness of either side's theory. (In this case, for example, motions were limited, and the military judge arraigned the accused and ruled on the few outstanding motions in the first twenty pages of transcript). While it is obvious *on appeal* what were the keys aspects of the case, such clairvoyance is not always available to the trial judge ruling on the challenge. This predicament can be resolved by requiring an objecting party to more clearly state the basis of their objection, to include as necessary, their theory of the case and how they believe the evidence will be presented. Additionally, this should serve as a *further* reminder to military judges to follow the *mandate* that defense challenges for cause be liberally granted. *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 1998).

[8] Of course, the fact that it was a junior member who holds an erroneous view of the law by no means purges the error. Rather, this merely reflects that the public has some understanding of military hierarchy and may reasonably fear that an erroneous view held by the highest ranking individual is more likely to seep into the deliberative process.

*precludes* that her erroneous views stem from military training, we must limit ourselves to the evidence in the record as developed by the parties at trial.

Next, we consider the degree to which the member's erroneous view of the law was technical or represented something more fundamental. We do not expect any panel member to have a walking-in understanding of when someone is legally incapable of consenting. Nonetheless, a belief that a person cannot consent after consuming any alcohol would likely be viewed by the public as objectively unreasonable. Accordingly, this weighs in favor of finding implied bias.

Third, there is no evidence that SFC JS's views on alcohol and consent were strongly held or would be unyielding to the military judge's instructions. Instead, the record indicates that after being informed that her views were incorrect SFC JS immediately–to the point of interrupting the military judge–agreed that she would follow the judge's instructions. In short, the record indicates that SFC JS's view of the law, while erroneous, was easily corrected.

Fourth, unlike in *Rogers*, the military judge clearly explained to SFC JS that her understanding of alcohol and consent "is not the law." Additionally, as this case was charged under Article 120 (2006 & Supp. IV 2011), the military judge gave the detailed statutory definitions of when someone is incapable of consent. Unlike *Rogers,* here the member was both informed that her initial view of the law was incorrect, and was specifically instructed on when someone is legally incapable of consenting.

Fifth, we consider the importance of the member's erroneous view of the law to the case. In this case, appellant was charged with two offenses alleging that the victim was incapable of consenting due to alcohol consumption. The government presented evidence and the panel deliberated and returned guilty findings on the offenses. However, after findings the military judge dismissed both offenses that alleged the victim was incapacitated. In *Rogers*, our superior court's evaluation of the totality of the circumstances surrounding an implied bias challenge included how the case was presented as well as a member's question arising out of deliberations. Thus, applying *Rogers* to this case would weigh heavily against appellant as he was ultimately not convicted of any offense alleging the victim was incapable of consenting. Nonetheless, we are wary of considering the military judge's dismissal of specifications after findings when determining whether the military judge erred in granting a challenge during voir dire. Accordingly, to the extent that such a consideration is relevant we will limit it to assessing prejudice.

Finally, and although we assign it little weight, we note that unlike *Rogers* and *Woods*, SFC JS was the junior member of the panel.

13

In considering the totality of the circumstances, viewed through the eyes of the public, an objective analysis does not reveal that the military judge erred in ensuring that "the court-martial [was] free from substantial doubt as to the legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). While SFC JS had an erroneous understanding of the law, her views were not inflexible. When told that her opinion was "not the law" there was no expression of surprise or concern. Instead, she immediately, and without hesitation or reservation, agreed to follow the military judge's instructions. Accordingly, we do not find that the military judge erred in denying the defense challenge for cause.

Even assuming the military judge erred in denying the defense challenge, we follow our superior court's lead in *Woods* and consider whether appellant was prejudiced by the error. *Woods*, 74 M.J. at 245 (assessing prejudice in accordance with Article 59(a)). In light of the fact that all specifications concerning consent and alcohol were dismissed before presentencing proceedings, we are convinced beyond a reasonable doubt that any error was harmless.

### B. Mistake of Fact

Appellant's second assignment of error asserts that the military judge erred in determining a mistake of fact as to consent defense was not raised by the evidence. A military judge has an affirmative duty to instruct on special defenses reasonably raised by the evidence. R.C.M. 920(e)(3). "The test for determining whether an affirmative defense of mistake of fact has been raised is whether the record contains some evidence of an honest and reasonable mistake to which the members could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). Put differently, an instruction on a defense is not required if no reasonable panel member could find the defense applicable. *United States v. Schumacher*, 70 M.J. 387, 389-90 (C.A.A.F. 2011).

When a defense has more than one element, in order for that defense to be reasonably raised by the evidence, there must be some evidence as to each separate element of the defense. As our superior court stated in *Schumacher*, "the military judge must answer the legal question of whether there is some evidence upon which members could reasonably rely to find that each element of the defense has been established." *Id*.

In the present case we review this issue de novo because the defense specifically preserved the issue by requesting the instruction. *United States v. Davis*, 75 M.J. 537, 542-43 (Army. Ct. Crim. App. 2015). We agree, however, with the military judge that the defense of mistake of fact was not raised by the evidence. Here, the only evidence regarding the abusive sexual contact was PFC JJ's testimony that she awoke to appellant touching her buttocks, a person with whom she had no prior romantic or sexual relationship. There is no evidence appellant believed she

14

consented to the touching, or that such a belief was reasonable. Notably, neither at trial nor on appeal does appellant show what evidence in the record put in issue his subjective belief that the victim had consented. Likewise, our independent review of the record finds none. To put the defense of mistake of fact in issue, there must be *some* evidence that appellant honestly believed PFC JJ consented to the touching. Such evidence is often established by appellant testifying as to his own perceptions, but that is not required. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998).

### C. Post-trial delay

Appellant complains he suffered an undue, nearly year-long post-trial delay. His court-martial was held on 10 and 11 December 2013. The 381-page record of trial was authenticated on 2 June 2014, but the staff judge advocate's recommendation (SJAR) was not signed until 6 October 2014 and not served until 20 October 2014. On 24 November 2014, the convening authority took action. For this delay, the government offers no explanation.

While we find no due process violation under *Barker v. Wingo*, 407 U.S. 514 (1972), we also find no reasonable explanation for the delay and processing errors in this case and accordingly provide relief. *See United States v. Collazo*, 53 M.J. 721, 727 (Army Ct. Crim. App. 2000) (Army Court referring to its Article 66(c), UCMJ, power when providing relief for the cumulative effect of post-trial delay as well as post-trial processing errors).

### CONCLUSION

The findings of guilty are AFFIRMED. After considering the entire record, the court AFFIRMS only so much of the sentence as provides for a dishonorable discharge, confinement for fourteen years and ten months, and reduction to the grade of E-1. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the sentence set aside by this decision are ordered restored. *See* UCMJ art. 58b(c) and 75(a).

Senior Judge TOZZI and Senior Judge CAMPANELLA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

15